1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WAYNE KAPPELMAN,

          Plaintiff,

    v.

CITY & COUNTY OF SAN FRANCISCO, et al.,

          Defendants.

Case No.  14-cv-04434-MEJ

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 18

**INTRODUCTION**

Plaintiff Wayne Kappelman ("Plaintiff") sues the City and County of San Francisco (the "City") and San Francisco Recreation and Parks Department ("RPD") Supervisor Steve Castile (collectively, "Defendants") for three causes of action: retaliation in violation of the California Family Rights Act ("CFRA"), Cal. Gov't Code § 12945.2(c)(2); violation of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601; and retaliation in violation of California Labor Code section 6310.  Compl., Dkt. No. 1.  Pending before the Court is Defendants' Motion for Summary Judgment on all three claims.  Dkt. No. 18.  The Court finds this Motion suitable for disposition without oral argument and **VACATES** the November 5, 2015 hearing.  *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b).  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** Defendants' Motion for the following reasons.

**BACKGROUND**

**A.     Factual Background**

The City hired Plaintiff in 2003 as a Gardener with RPD.  Kappelman Dep. at 18:20-25, attached to Berkowitz Decl. as Ex. A, Dkt. No. 24.  He was promoted to a Park Section Supervisor in a provisional capacity in 2006.  *Id.* at 22:2-5, 23:14-17 & Ex. C attached thereto.  Plaintiff became a permanent Supervisor in 2008.  *Id.* at 23:8-12 & Ex. B.  Plaintiff worked continuously at Harding Park Golf Course, one of the City's five golf courses, from the beginning of his employment with the City until the winter of 2009.  *Id.* at 27:15-19, 29:15-16.

Castile has been employed by the City as the golf and turf manager since July 2009.

1    Castile Dep. at 8:6-12, attached to Brock Decl. at Ex. 1, Dkt. No. 34.  His duties include

2    supervising the City's five golf courses.  *Id.* at 9:9-16.  Castile became Plaintiff's supervisor in

3    July of 2009.  Kappelman Dep. at 26:4-8.

4           Castile testified that the City is supposed to give a performance evaluation to each

5    supervisor and employee every fiscal year.  Castile Dep. at 18:13-19.  He signed a Performance

6    Plan and Appraisal Report for Kappelman for the period July 1, 2009 through June 30, 2010.  *Id.*

7    at 19:16-20:6; Kappelman Decl., Ex. 3, Dkt. No. 31.  In the Performance Plan, Castile gave

8    Kappelman an overall performance rating of 8, meaning he exceeded Castile's expectations for

9    overall performance.  Kappelman Decl., Ex. 3.  Castile stated Plaintiff "has done an excellent job

10   with minimal staffing on the course," "changed several of the working schedules to provide better

11   coverage and use of his employees," and "changed several of the working schedules to provide

12   better coverage and use of his employees."  *Id.*  Castile acknowledged in his deposition that this

13   was accurate.  Castile Dep. at 22:24-23:9.  However, he testified at his deposition that his

14   assessment of Plaintiff's overall performance in the Performance Plan was false, and if he had

15   written the truth, he would have given Plaintiff an overall performance rating of 3, meaning "Does

16   not meet reported expectations for overall performance for this position."  *Id.* at 20:7-17, 28:21-25,

17   29:2-8.

18          In October of 2009, the President's Cup Golf Tournament took place at Harding Park.

19   Kappelman Dep. at 29:17-19.  While preparing the course for the President's Cup, Plaintiff's crew

20   applied the wrong rate of fertilizer on several greens on the course, resulting in the greens being

21   "burned" or dried out.  *Id.* at 30:18-31:4.  Plaintiff was not disciplined in connection with this

22   incident.  *Id.* at 31:2-10.

23          Plaintiff was transferred from Harding Park Golf Course in late 2009.  *Id.* at 31:11-13.

24   Plaintiff testified he was informed of his transfer by RPD General Manager Phil Ginsburg, in a

25   meeting with Ana Alvarez (Deputy Director III for RPD), Kin Gee (RPD Human Resources

26   Manager), and Castile.  *Id.* at 32:10-15.  Plaintiff testified he was informed the transfer was due to

27   communication problems with Professional Golfers' Association personnel that ran the President's

28   Cup Golf Tournament.  *Id.* at 33:1-4.  Castile testified he did not recall any discussion of the

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    reason for relocating Plaintiff.  Castile Dep. at 26:17-27:19.  Ginsburg gave Plaintiff the option of

2    moving to Sharp Park Golf Course or the sod crew; he chose Sharp Park because he wanted to

3    stay in golf.  Kappelman Dep. at 33:7-12.  Plaintiff maintained the same hourly wage when he was

4    moved to Sharp Park in early 2010.  *Id.* at 33:20-23, 34:15-19.  At the time of the transfer,

5    Plaintiff knew Sharp Park Golf Course is a designated protected wildlife area by the United States

6    Wildlife Service.  *Id.* at 34:4-12; Alvarez Decl. ¶ 4, Dkt. No. 19.

7         Plaintiff testified he does not recall bringing any safety complaints to Castile's attention in

8    2010.  Kappelman Dep. at 36:13-15.  In Plaintiff's 2010-2011 Performance Plan, Castile states

9    Plaintiff had improved from the prior year, "exceeded my expectations towards his duties and

10   responsibilities at Sharp Park Golf Course," and was "a very dependable supervisor and has

11   significantly improved the conditions at Sharp Park Golf Course.  He is a very valuable employee

12   and continues to improve each year."  Kappelman Decl., Ex 4.  Castile gave Plaintiff an overall

13   performance rating on the border between meeting and exceeding expectations.  *Id.*  However,

14   Castile testified that review was not true at the time he wrote it.  Castile Dep. at 34:10-15.

15        Plaintiff testified he first reported a safety issue to Castile in the beginning of 2011, when

16   he reported a plumbing leak at Sharp Park.  Kappelman Dep. at 38:15-25.  At the time of his

17   deposition, Plaintiff testified he believed he reported the leak to Castile by email, but he did not

18   recall when he made the report.  *Id.* at 39:19-40:17.  That year, in Plaintiff's 2011-2012

19   Performance Plan, Castile gave Plaintiff an overall performance rating between met and exceeded

20   expectations.  Kappelman Decl., Ex. 5.  Castile admits this assessment was accurate at the time he

21   gave it.  Castile Dep. at 38:4-17.  He testified he did not recall any criticisms of Plaintiff's

22   performance at Sharp Park in September 2011 and could not remember if he thought Plaintiff was

23   doing a good job as supervisor of Sharp Park at that time.  *Id.* at 62:19-63:5.

24        Plaintiff also submitted work orders to the City in December 2011 "regarding numerous

25   irrigation leaks at Sharp Park."  Kappelman Decl. Ex. 8 ("Work Order Status," dated Dec. 9,

26   2011).  He also wrote emails to Castile regarding unspecified leaks.  *Id.*, Exs. 7 ("All leaks remain

27   unfixed which is causing real problems in the canyon.") & 9 ("Yesterday plumber and HEO came

28   down and fixed 1 leak on 13.  Still have 4-5 leaks to go.").  Plaintiff also notified Castile of eight

1   different leaks on the golf course in an email dated August 15, 2012.  Kappelman Dep., Ex. D.

2   Neither party has presented evidence that Castile responded to these emails.  In general, Castile

3   would offer to help when Plaintiff made any safety complaints, such as sending a plumber to

4   Sharp Park to help fix any leaks.  *Id.* at 43:17-20.  However, Plaintiff does not recall whether he

5   asked Castile to send a plumber to help fix the leaks in 2011 or not.  *Id.* at 46:13-17.

6          Plaintiff notified Castile of various issues at Sharp Park in a February 1, 2013 email, in

7   which he listed needed repairs in response to Castile's request for priorities at Sharp Park.  *Id.* at

8   55:6-25 & Ex. E.  Plaintiff also emailed Castile on July 1 and 5, 2013.  *Id.*, Exs. F-H.  Regarding

9   safety issues, Plaintiff complained on July 1 that he and the crew had to urinate and defecate

10  outside, or use the restrooms at a nearby Safeway during the early morning hour before the golf

11  course clubhouse restrooms opened at 6:30 a.m., because there was insufficient lighting in the

12  portable toilets.  *Id.*, Ex. F.  Castile responded by email on July 1: "Every week, I ask you for

13  updates and we have gone over almost all of these items of concern.  You already know the plan

14  of action for the items."  *Id.*, Ex. G.  Plaintiff's next email on July 5, 2013 listed outstanding work

15  at Sharp Park, including the removal of dead trees.  *Id.*, Ex. H.  Plaintiff testified Castile and

16  Kevin Teahan, Buildings and Group Maintenance Supervisor at Harding Park Golf Course, came

17  to Sharp Park to discuss the irrigation leaks with him in 2012 and 2013, but he did not recall

18  whether they provided training on how to detect leaks and turn the main valve off.  *Id.* at 51:22-

19  52:9.

20         On September 25, 2013, Plaintiff sent Castile an email regarding the restroom facilities at

21  Sharp Park.  *Id.*, Ex. J.  Plaintiff claimed the portable toilets were unsafe as the doors would not

22  close or lock properly and the facilities were in disrepair.  *Id.* at 68:23-25, 69:1-5.  Plaintiff

23  testified the gardeners arrived for work at 5:00 a.m. and, although they were permitted to use the

24  clubhouse restrooms, the clubhouse opened by 5:30 a.m. less than once a week and sometimes had

25  not opened by 6:30 a.m.  *Id.* at 70:1-15, 71:6-17.  Castile told Plaintiff to request a key to the

26  clubhouse from the owner so staff could use the clubhouse for that hour or so before it opened.  *Id.*

27  at 74:19-23.  Plaintiff obtained the key in November of 2013, after which everyone on his staff

28  could use the clubhouse restrooms when they arrived.  *Id.* at 75:10-18, 77:22-25.

United States District Court
Northern District of California

4

1    Plaintiff also sent Castile an email on September 25, 2013 entitled "Shitty equipment,"

2  informing him that the Sharp Park greens mowers had mechanical problems. *Id.* at 78:15-22 &

3  Ex. K. He stated: "Training apprentices on such old equipment is quite unsafe." *Id.*, Ex. K.

4  Plaintiff admits he had the authority to instruct one of the teamsters under his supervision to bring

5  any unsafe or broken equipment Sharp Park to Harding Park for repair. *Id.* at 79:22-25.

6    At some point, Plaintiff informed Castile he had urinated and defecated in Sharp Park.

7  Castile Dep. at 133:22-134:16. Plaintiff admits he urinated and defecated outside, and that such

8  action was inappropriate given the golf course was a protected area. Kappelman Dep. at 96:17-23.

9  On October 18, 2013, Castile gave Plaintiff a written reprimand for his use of profanity in sending

10  the September 25, 2013 "Shitty equipment" email, as well as for his failure to "down" unsafe

11  equipment. *Id.* at 87:7-19 & Ex. N. Castile testified he also heard Harding Park Golf Course

12  supervisor Keven Teahan use profanity, but Castile did not issue a reprimand in that instance.

13  Castile Dep. at 125:8-126:3.

14    On September 23, 2013, Plaintiff requested a thirty-day vacation—from February 17 to

15  March 28, 2014. Kappelman Dep. at 115:8-19 & Ex. DD. That vacation request was not

16  approved. *Id.*, Ex DD. Plaintiff is not aware of any other park section supervisors who take

17  thirty-day vacations. *Id.* at 115:23-25.

18    Plaintiff submitted his first request for leave under the FMLA on February 4, 2014,

19  requesting leave from January 30 to February 14, 2014. *Id.*, Ex. HH. His request was granted.

20  *Id.*, Ex. JJ. He then submitted an additional request for FMLA leave from February 15 through

21  February 26, 2014. *Id.* at 126:18-25 & Ex. GG. This additional request was also granted. *Id.* at

22  128:17-19, 129:15-16.

23    On February 25, 2014, Alvarez sent Plaintiff a memo welcoming him back from his leave

24  and informing him of his new work assignment as a Park Section Supervisor for Glen Park/Balboa

25  Gardening Complex. *Id.*, Ex. OO. Plaintiff has been in the supervisory position at Glen Park

26  since his transfer there in 2014. *Id.* at 137:13-15. His hourly wage at Glen Park is less than he

27  earned at Sharp Park, as his wage dropped from $39.75 to $37.50. *Id.* at 136:14-25.

28    Castile wrote portions of a Performance Plan for 2013-2014, dated December 23, 2014, in

United States District Court
Northern District of California

5

1   which he wrote: "Mr. Kappelman did not meet the job responsibilities for the first nine months

2   while working at Sharp Park Golf Course." Kappelman Decl., Ex. 6. Castile did not write a

3   Performance Plan for Plaintiff for 2012-2013; he testified he was too busy to do so. Castile Dep.

4   at 43:13-25.

5   **B.      Procedural Background**

6           On September 2, 2014, Plaintiff commenced this action in San Francisco Superior Court.

7   He brings three claims: (1) retaliation in violation of the CFRA, against the City only; (2) violation

8   of the FMLA, against the City only; and (3) workplace retaliation in violation of California Labor

9   Code section 6310, against both Defendants. *See* Compl. Defendants removed the case to this

10  Court on October 2, 2014. Dkt. No. 1.

11          Defendants filed the present Motion for Summary Judgment on September 24, 2015. They

12  argue Plaintiff's first and second causes of action fail because he cannot establish the required

13  causal link between any adverse employment action and his taking a medical leave. Mot. at 1.

14  They argue Plaintiff's third cause of action fails because he has not filed a Government Claims

15  Act claim under California Government Code section 910.

**LEGAL STANDARD**

16

17          Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

18  that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

19  judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment

20  bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

21  demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

22  317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v.*

23  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is

24  sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

25          Where the moving party will have the burden of proof on an issue at trial, it must

26  affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

27  party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where

28  the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

United States District Court
Northern District of California

1    pointing out to the district court that there is an absence of evidence to support the nonmoving

2    party's case.  *Celotex*, 477 U.S. at 324-25.

3            If the moving party meets its initial burden, the opposing party must then set forth specific

4    facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ.

5    P. 56(e); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most

6    favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir.

7    2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of

8    triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the

9    nonmoving party to identify with reasonable particularity the evidence that precludes summary

10   judgment."  *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

11   Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine

12   issue of fact, where the evidence is not set forth in the opposing papers with adequate references

13   so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031

14   (9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled

15   to a judgment as a matter of law."  *Celotex*, 477 U.S. at 323 (internal quotations omitted).

16                                              **DISCUSSION**

17   **A.      Violation of FMLA and CFRA**

18           Defendants first argue Plaintiff fails to establish a claim under the FMLA and CFRA

19   because it is undisputed the City granted his request for medical leave.  Mot. at 8, 10.  Defendants

20   contend the City did not subject Plaintiff to an adverse employment action because he took such

21   leave, and he is unable to establish a causal connection between his transfer to Glen Park and his

22   request for medical leave.  *Id.* at 8-9.  Defendants maintain he was transferred for performance

23   problems at both Harding Park and Sharp Park Golf Courses, alleging he: (1) negligently

24   supervised a crew that burned the back greens while preparing for the President's Cup; (2) was

25   dismissive and disrespectful to Professional Golfers' Association personnel who ran the

26   tournament; and (3) ignored federal wildlife regulations protecting endangered species by

27   urinating and defecating outside.  *Id.* at 9-10.

28           In response, Plaintiff argues the evidence establishes a triable issue of fact because the City

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    transferred him away from Sharp Park while he was on medical leave, and the transfer resulted in

2    a reduction of his pay.  Opp'n at 1, Dkt. No. 26.

3            "The FMLA creates two interrelated, substantive employee rights: first, the employee has a

4    right to use a certain amount of leave for protected reasons, and second, the employee has a right

5    to return to his or her job or an equivalent job after using protected leave."  *Bachelder v. Am. W.*

6    *Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)).  It is

7    "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to

8    exercise" these rights.  29 U.S.C. § 2615(a)(1); *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th

9    Cir. 2011).

10           Prohibited acts under § 2615(a) of the FMLA fall into two general categories: (1)

11   "interference" claims under § 2615(a)(1), and (2) "retaliation/discrimination" claims under §

12   2615(a)(2).  *Latif v. M & C Hotel Interests, Inc.*, 2012 WL 893729, at *3 (C.D. Cal. Mar. 14,

13   2012).  However, as the Ninth Circuit has explained, "[b]y their plain meaning, the anti-retaliation

14   or anti-discrimination provisions [of the FMLA] do not cover visiting negative consequences on

15   an employee simply because he has used FMLA leave.  Such action is, instead, covered under §

16   2615(a)(1), the provision governing 'Interference [with the] Exercise of rights.'"  *Bachelder*, 259

17   F.3d at 1124.  Accordingly, "when a plaintiff alleges retaliation for exercise of FMLA rights, that

18   claim is properly analyzed as an interference claim under section 2615(a)(1)."  *Rivera v. FedEx*

19   *Corp.*, 2013 WL 6672401, at *6 (N.D. Cal. Dec.18, 2013); *Bachelder*, 259 F.3d at 1122-23

20   (explaining that using protected leave as a negative factor in employment decisions violates the

21   FMLA because "attaching negative consequences to the exercise of protected rights surely 'tends

22   to chill' an employee's willingness to exercise those rights").

23           The CFRA is California's counterpart to the FMLA.  The Ninth Circuit has held that

24   FMLA and CFRA claims may be analyzed together, "[s]ince CFRA adopts the language of the

25   FMLA and California state courts have held that the same standards apply."  *Xin Liu v. Amway*

26   *Corp.*, 347 F.3d 1125, 1132 n.4 (9th Cir. 2003) (citing *Dudley v. Dep't of Transp.*, 90 Cal. App.

27   4th 255, 261 (2001)); *see also Lew v. Superior Ct.*, 348 F. App'x 227, 229 (9th Cir. 2009) ("The

28   CFRA adopts the same language as the FMLA, and California state courts have held that the same

United States District Court
Northern District of California

1    standards apply; therefore, this memorandum will treat both causes of action together.").

2          To establish an interference claim, a plaintiff must show by the preponderance of the

3    evidence that (1) he took "FMLA-protected leave" and (2) it constituted "a negative factor" in an

4    adverse employment decision. *Bachelder*, 259 F.3d at 1122, 1125.  Evidence in support of the

5    claim may be direct, circumstantial, or both.  *Id.* at 1125.

6          Here, the Court's focus is on: (1) whether the City failed to properly reinstate Plaintiff to

7    the same or a comparable position after his return from leave, and (2) whether the City

8    impermissibly used Plaintiff's leave as a "negative factor" in the decision to transfer him.

9    Drawing all reasonable inferences in the light most favorable to Plaintiff, the Court finds he has

10   set forth specific facts showing there are genuine issues for trial on these issues, thus making

11   summary judgment improper.

12         First, it is undisputed Plaintiff's hourly wage at Glen Park is less than he earned at Sharp

13   Park, as his wage dropped from $39.75 to $37.50.  Kappelman Dep. at 136:14-25.  Defendants

14   attempt to minimize this wage decrease.  *See* Mot. at 8 ("Plaintiff's hourly wage decreased *slightly*

15   when he was transferred to Glen Park—from $39.75 an hour to $37.50 per hour, although his title

16   and position did not change.") (emphasis added).  However, Defendants cite no authority

17   establishing that a job transfer resulting in a salary decrease of over $4,000 per year (assuming a

18   forty-hour workweek) constitutes the same or a comparable position.  *Compare Yen v. Yang Ming*

19   *(Am.) Corp.*, 2005 WL 6133905, at *7 (C.D. Cal. Nov. 8, 2005) (no genuine issue of material fact

20   where, "[b]efore and after his leave, Plaintiff was entitled to and received the same pay, benefits,

21   and terms and conditions of employment."); *Jadwin v. Cty. of Kern*, 610 F. Supp. 2d 1129, 1163

22   (E.D. Cal. 2009) (genuine issues of material fact existed as to whether physicians use of FMLA

23   was a negative factor in the decision to remove him from his chairmanship and then cut his pay,

24   precluding summary judgment for employer on physician's FMLA interference claim).  Further,

25   Defendants admit Plaintiff's transfer was not the same position, as the wage reduction "was

26   because he no longer earned the premium wage of supervising teamsters, who work on the golf

27   courses."  Mot. at 8.  Thus, the Court cannot find as a matter of law Plaintiff was reinstated to the

28   same or a comparable position after his return from leave.

1         Second, although Defendants argue Plaintiff cannot show the City transferred him because

2    he took a medical leave, Mot. at 9, a reasonable jury could conclude otherwise.  Defendants

3    contend Plaintiff's transfer occurred for performance problems, including his negligent

4    supervision of a crew that burned the back greens while preparing for the President's Cup in 2009,

5    his alleged dismissive and disrespectful behavior to Professional Golfers' Association personnel

6    who ran the tournament, and that he ignored federal wildlife regulations by urinating and

7    defecating outside.  *Id.* at 9-10.  Defendants also contend Ginsburg, who made the decision to

8    transfer Plaintiff, had no knowledge Plaintiff requested and been granted medical leave when he

9    made the decision.  *Id.* at 10 (citing Ginsburg Decl. ¶ 3, Dkt. No. 21).

10        However, Plaintiff has also set forth evidence regarding his transfer which, drawing all

11   reasonable inferences in the light most favorable to him, show there are genuine issues for trial.

12   Plaintiff notes Defendants present no evidence the City contemplated transferring him prior to his

13   medical leave.  Opp'n at 3; *see* Brock Decl., Ex. 3, Dkt. No. 36 (Defs.' Resp. to Special Interrog.

14   No. 2 ("The decision to transfer Plaintiff was made sometime between February 22-25, 2014.")).

15   Even assuming Ginsburg did not know Plaintiff was on medical leave, Alvarez made the

16   recommendation that Ginsburg transfer Plaintiff, and she admits she knew he was on a medical

17   leave at the time she made the recommendation.  Alvarez Decl. ¶¶ 6, 7.  "When the 'temporal

18   proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is

19   sufficient standing alone to create an inference of causality and defeat summary judgment.'"

20   *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307, 311 (3d Cir. 2012) ("We believe,

21   therefore, that Lichtenstein has met her burden of demonstrating pretext because . . . the timing of

22   [UPMC's] decision could lead a fact finder to infer that [Lichtenstein] would not have been fired

23   absent her taking of leave." (internal quotation and citation omitted; alterations in original)); *Kohls*

24   *v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001) (although ultimately affirming

25   summary judgment for the employer because the record was "clear" that "the employer did not

26   discover many of the deficiencies in [the employee's] work . . . until after [the employee] took

27   leave," the Seventh Circuit noted: "We can imagine circumstances in which the timing of this

28   decision could lead a fact finder to infer that the employee would not have been fired absent her

United States District Court
Northern District of California

1    taking of leave (if, for example, a supervisor who had been aware of problems with an employee

2    did not decide to fire the employee until she took leave, and the supervisor based the firing on the

3    incidents of which the employer had already been aware)." (alterations in original)).  Here, the

4    City was aware of Plaintiff's alleged performance issues well before his medical leave, yet it did

5    not transfer him until the time of his leave, there is a genuine issue as to whether his leave

6    impacted the transfer decision.  *See Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 488-

7    90 (6th Cir. 2005) ("The record . . . shows that [the employer] was aware of many of Moorer's

8    alleged performance deficiencies prior to his FMLA leave, thereby casting doubt on the timing of

9    the purported reasons for his termination." (alteration in original)).

10          Even if the temporal proximity in this case is not unduly suggestive, there is other evidence

11   from which an inference of causation can be drawn.  Defendants argue Plaintiff was transferred, in

12   part, because of the President's Cup greens incident in 2009.  Mot. at 9-10.  However, it is

13   undisputed he was not disciplined for the incident.  Kappelman Dep. at 31:2-10.  Plaintiff also

14   directs the Court's attention to evidence of his performance evaluations, including the 2009-2010

15   evaluation, in which Castile stated Plaintiff exceeded his expectations for overall performance,

16   "has done an excellent job with minimal staffing on the course."  Kappelman Decl., Ex. 3.  In the

17   2010-2011 evaluation, Castile states Plaintiff had improved from the prior year, "exceeded my

18   expectations towards his duties and responsibilities at Sharp Park Golf Course," and was "a very

19   dependable supervisor and has significantly improved the conditions at Sharp Park Golf Course.

20   He is a very valuable employee and continues to improve each year."  *Id.*, Ex 4.  Despite these

21   positive evaluations, Castile now testifies the assessments he wrote were false.  Castile Dep. at

22   20:7-17, 28:21-29:8, 34:10-15, 35:17-36:6.  As to the reprimand Plaintiff received for using the

23   term "shitty" in an email to Castile, it is undisputed Castile did not reprimand Teahan for using

24   profanity at work.  *Id.* at 125:8-126:3.

25          Based on this conflicting evidence, a reasonable jury could conclude Plaintiff's medical

26   leave was used as a negative factor in the decision to transfer him to Glen Park.  This is a question

27   of fact, and the jury may weigh and consider relevant evidence on the issue.  Therefore, construing

28   the evidence and reasonable inferences in favor of Plaintiff, a genuine issue of material fact exists

United States District Court
Northern District of California

11

1    as to whether the City failed to properly reinstate Plaintiff to the same or a comparable position

2    after his return from leave, and whether Plaintiff's use of medical leave was a negative factor in

3    the City's transfer decision.  Accordingly, Defendants' Motion for Summary Judgment as to the

4    FMLA and CFRA claims is **DENIED**.

5    **B.     Violation of California Labor Code Section 6310**

6            As to Plaintiff's section 6310 claim, Defendants argue he is unable to establish such a

7    claim as a matter of law because he failed to file a government tort claim.  Mot. at 11.  In

8    response, Plaintiff argues he substantially complied with the tort claim requirement when his

9    attorney sent a notice to the City informing it of Plaintiff's claims on July 3, 2014.  Opp'n at 1, 4.

10           California Labor Code section 6310(b) provides: "Any employee who is discharged,

11   threatened with discharge, demoted, suspended, or in any other manner discriminated against in

12   the terms and conditions of employment by his or her employer because the employee has made a

13   bona fide oral or written complaint . . . of unsafe working conditions, or work practices, in his or

14   her employment or place of employment . . . shall be entitled to reinstatement and reimbursement

15   for lost wages and work benefits caused by the acts of the employer."  The policy behind section

16   6310 is "to prevent retaliation against those who in good faith report working conditions they

17   believe to be unsafe." *Freund v. Nycomed*, 347 F.3d 752, 759 (9th Cir. 2003); *see also Taylor v.*

18   *Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 485 (2000) ("Labor Code section 6310 is part of

19   California's statutory scheme for occupational safety.").  Although section 6310 is silent regarding

20   administrative remedies, section 98.7, subdivision (a), provides in pertinent part: "Any person who

21   believes that he or she has been discharged or otherwise discriminated against in violation of any

22   law under the jurisdiction of the Labor Commissioner may file a complaint with the division

23   within six months after the occurrence of the violation."  Cal. Lab. Code § 98.7(a).

24           Prior to 2014, the general rule of exhaustion of administrative remedies in California was

25   "'that where an administrative remedy is provided by statute, relief must be sought from the

26   administrative body and this remedy exhausted before the courts will act.'" *Campbell v. Regents*

27   *of Univ. of Cal.*, 35 Cal. 4th 311, 319 (2005) (quoting *Abelleira v. Dist. Ct. of Appeal*, 17 Cal. 2d

28   280, 292 (1941)).  This was so even where the administrative remedy is couched in permissive, as

United States District Court
Northern District of California

opposed to mandatory, language.  *Williams v. Housing Auth. of Los Angeles*, 121 Cal. App. 4th 708, 734 (2004).  However, effective January 1, 2014, the California Legislature passed two new laws amending the Labor Code's statutory scheme and effectively overruling *Campbell*.  First, the Legislature amended California Labor Code section 98.7 to add subsection (g), which provides: "In the enforcement of this section, there is no requirement that an individual exhaust administrative remedies or procedures."  Cal. Lab. Code § 98.7(g).  The Legislature also enacted Labor Code section 244, which provides: "An individual is not required to exhaust administrative remedies or procedures in order to bring a civil action under any provision of this code, unless that section under which the action is brought expressly requires exhaustion of an administrative remedy."  Cal. Lab. Code § 244(a).

As section 6310 contains no mandatory exhaustion requirement, the Court finds Plaintiff was not required to exhaust administrative remedies before filing suit.  *See Ramirez v. Cty. of Marin*, 578 F. App'x 673, 674 (9th Cir. 2014) (recognizing "that one generally does not have to exhaust administrative remedies prior to filing a civil action for a violation of the California Labor Code."); *Reynolds v. City & Cty. of S.F.*, 576 F. App'x 698, 700 (9th Cir. 2014) (same).  As Defendants raise no arguments regarding the substance of Plaintiff's section 6310 claim, there Motion for Summary Judgment as to this claim is **DENIED**.

### CONCLUSION

Based on the analysis above, the Court hereby **DENIES** Defendants' Motion for Summary Judgment.[1]

**IT IS SO ORDERED.**

Dated: October 27, 2015

_____
MARIA-ELENA JAMES
United States Magistrate Judge

---

[1] Plaintiff made objections to a variety of documents and other evidence Defendants submitted in support of their Motion.  Dkt. No. 28.  However, the Court has not considered this evidence as part of its analysis, and Plaintiff's evidentiary objections are therefore moot.

United States District Court
Northern District of California